STATE OF CONNECTICUT *v.* ANTHONY RIVERA
(SC 16964)

Sullivan, C. J., and Norcott, Katz, Vertefeuille and Zarella, Js.

Argued November 25, 2003—officially released April 6, 2004

*Glenn W. Falk,* special public defender, with whom, on the brief, was *Kate Mogulescu,* law student intern, for the appellant (defendant).

*Timothy J. Sugrue,* senior assistant state's attorney, with whom, on the brief, was *David Shepack,* state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Anthony Rivera, was convicted, following a jury trial, of murder in violation of General Statutes § 53a-54a,[1] felony murder in violation

---

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there

of General Statutes § 53a-54c,[2] burglary in the first degree in violation of General Statutes § 53a-101 (a) (2),[3] arson in the second degree in violation of General Statutes § 53a-112 (a) (1) (B),[4] and tampering with evidence in violation of General Statutes § 53a-155 (a).[5]

was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] General Statutes § 53a-54c provides: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[3] General Statutes § 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

[4] General Statutes § 53a-112 (a) provides in relevant part: "A person is guilty of arson in the second degree when, with intent to destroy or damage a building, as defined in section 53a-100, (1) he starts a fire or causes an explosion and . . . (B) such fire or explosion was intended to conceal some other criminal act . . . ."

[5] General Statutes § 53a-155 (a) provides: "A person is guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pending, or about to be instituted, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding; or (2) makes, presents or uses any record, document or thing knowing it to be false and with purpose to mislead a public servant who is or may be engaged in such official proceeding."

On appeal,[6] the defendant claims that the trial court improperly: (1) allowed a witness to testify about a statement made by another person who was not a trial witness, describing that person's involvement in the crimes with which the defendant was charged, thereby depriving the defendant of his confrontation rights under the sixth amendment to the federal constitution and his due process rights under both the state and federal constitutions; (2) deprived the defendant of his constitutional rights to due process and a fair trial when it denied his requests for a one day continuance to allow him the opportunity to rehabilitate his alibi witness; and (3) deprived the defendant of his constitutional rights to due process and a fair trial by denying his motion for a mistrial following the court's decision to deny his motion for a continuance. We reject the defendant's claims and, accordingly, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the fall of 1996, the victim, Audrey Lover, resided at 201 West West Hill Road in Barkhamsted. Her daughter, Jennifer Cosseboom, was a college student living on campus at Central Connecticut State University (university) in New Britain. Cosseboom socialized with a group of teenagers and young adults, including the defendant and Michael Glanville, many of whom frequently gathered at the home of Lynn Ducharme,[7] a drug-addicted woman who lived in Winsted.

On the evening of October 16, 1996, the victim visited her close friend and neighbor, Pamela Balsamo, until approximately 9 p.m. While the victim was there, the

---

[6] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[7] In 1996, Ducharme was using her married name. At the time of her trial testimony in 2001, however, she identified herself as Lynn Williamson. References herein are to Ducharme.

defendant telephoned Balsamo's house looking for Cosseboom's telephone number. That same night, the university's police dispatch records logged an attempt by a person who identified himself as Tony Robledo, one of several aliases used by the defendant, to contact Cosseboom. Additionally, Ducharme's telephone records show that, in the evening hours on October 16, two telephone calls were made to the university.

Later that same evening, several youths, including the defendant, Glanville and John Rizzi, gathered at Ducharme's house for a party. At one point in the evening, Ducharme emerged from her bedroom yelling for everyone to keep the noise down. She argued with Glanville, in particular, concerning long-distance calls that he had made with her telephone, and then she returned to her bedroom. Soon thereafter, the defendant, Glanville and Rizzi departed in Rizzi's car, with Rizzi driving. According to Rizzi, he drove Glanville and the defendant to a house in Barkhamsted that, in Rizzi's description, was consistent in appearance and location to Balsamo's home.

Shortly before 7 a.m. the following morning, October 17, 1996, Theresa Blanchard and her son were passing by the victim's house when they noticed that it was on fire. They alerted the victim's neighbors, who called 911, and fire and rescue personnel arrived on the scene soon thereafter. Firefighters found that both the front and back doors to the victim's home were closed and unlocked. Once inside, they discovered the victim's naked body lying on the floor in the lower level of the house. A small fire was burning on the victim's body, which had been badly burned.

An investigation revealed that the fire had been set deliberately. Flammable liquid and other combustible material had been poured onto the victim's body, which then had been ignited. Additionally, an oil lamp was

found in several pieces on the lower level of the house; the wick assembly of the lamp was found between the victim's legs, and the base and chimney of the lamp were on top of a television. Subsequent forensic tests revealed that samples of carpeting and charred wood removed from the victim's house contained a liquid substance that was consistent with the oil from the oil lamp. On the basis of the results of an autopsy performed on the victim by Harold Wayne Carver, the state's chief medical examiner, he determined that the victim's cause of death was manual strangulation. Although Carver could not pinpoint the time of death, he determined that the victim had eaten not many hours before her death.

Some time in the late fall of 1996, several people overheard conversations of the defendant in which he made incriminating statements. Anaira Rodriguez, who was involved romantically with the defendant at the time, overheard him state that "he [had] killed a woman" and had "fucked her up because she got stupid." She also heard him make some mention of a fire. Leonard St. Denis, another friend of the defendant, related how the defendant had told him that he and Glanville had broken into the victim's home, that the defendant had choked the victim to death because he believed she could identify him and that the defendant and Glanville had started a fire "to get rid of the evidence" using, as an accelerant, an oil lamp located on the premises. St. Denis' description of the event, as told to him by the defendant, was consistent with the physical evidence found by the police. On another occasion, while watching a television news report about the victim's homicide, the defendant told St. Denis that "that's the woman I did." Finally, in June, 1997, in a conversation with Joan Longo, the defendant threatened that if he did not get money owed to him by a third person, he would "jack that bitch like he did

Audrey," and he engaged in a strangulation gesture. The medical examiner's findings of injuries to the victim's neck were consistent with strangulation.

Glanville also made incriminating statements. In March, 1997, he drove his nephew, Julio Caraballo, to a lake in Barkhamsted and confided in him that he and the defendant had broken into a woman's house looking for items to steal. Glanville stated that when he and the defendant were discovered by the woman, the defendant choked her and used an oil lamp to burn the house in an attempt to destroy any evidence.

The defendant was arrested in May, 1998, pursuant to a fugitive warrant in an unrelated case, and subsequently was charged in connection with the offenses in the present case in August, 1998. After learning that Glanville had given the police a statement, the defendant gave a statement implicating Glanville. According to the defendant, Glanville had told him that he had broken the victim's neck and then burned the house in an attempt to destroy the evidence. The defendant explained that Glanville believed that Cosseboom, the victim's daughter, would collect $2 million in insurance proceeds and that Glanville would benefit because Cosseboom would be "hooking [him] up." The defendant, however, refused to swear to his statement, stating: "I can't pay back with a lie."

The jury returned a verdict of guilty on all the counts. Thereafter, the trial court rendered judgment in accordance with the verdict and sentenced the defendant to a total effective sentence of fifty-four years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

We first address the defendant's claim that the trial court improperly allowed Caraballo to testify concern-

ing Glanville's statement to him, and thus violated the defendant's right to confrontation under the sixth amendment[8] to the United States constitution, and his right to due process under the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution.[9] In response, the state contends that the trial court properly admitted Glanville's statement under the hearsay exception for statements against penal interest, and that the admission of that statement did not violate the defendant's right to confrontation. We agree with the state.

The following additional facts and procedural history are relevant to our resolution of this claim. After the defendant's trial had begun, Glanville's nephew, Caraballo, was arrested on a charge unrelated to the present case. While he was in custody, he told state police about the statement that Glanville had made to him at the lake in March, 1997.

When he was first called to testify in the defendant's case, Caraballo answered some background questions but then expressed reluctance about testifying further. He ultimately refused to answer any further questions. The court, at the urging of the state, then held Caraballo in contempt. Before sending him to prison, the court afforded Caraballo the opportunity to confer with coun-

---

[8] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The sixth amendment right of confrontation is made applicable to the states through the due process clause of the fourteenth amendment. See *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

[9] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

The constitution of Connecticut, article first, § 8, provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ." Because the defendant has failed to provide an independent analysis of his due process claims, we decline to review them. See *State* v. *Wilkes*, 236 Conn. 176, 183 n.9, 671 A.2d 1296 (1996).

sel. After speaking with his attorney, Caraballo returned to the courtroom and testified as to the nature of his conversation with Glanville in March, 1997. Caraballo testified that Glanville had told him: " 'We broke into some lady's house . . . fucked up, shit happened.' " According to Caraballo, Glanville explained that he and the defendant had broken into the victim's house in search of jewelry, and that Glanville had remained in the kitchen as a lookout as the defendant went through the house. The victim came into the kitchen, and noticed Glanville, who covered his face. The defendant then emerged from a bedroom and entered the kitchen where he started choking the victim, who fell to the floor. At that point, the defendant picked up a lamp and Glanville ran out of the house. After recounting this incident to Caraballo, Glanville admonished him: "Whatever you do, don't tell anyone."

Caraballo testified that the police had told him that his statement at the police station would "help" his uncle. On cross-examination, the defendant explored the circumstances under which Caraballo had given the statement to the police, asking Caraballo about his conversation with John Pudlinski, a police inspector with the state's attorney's office, division of criminal justice,[10] who was aiding in the investigation. The following colloquy occurred between defense counsel and Caraballo:

"Q. And [Pudlinski] told you that if you told him the information that he wanted to hear, it would help your uncle, correct?

"A. Yes.

"Q. And the information that you want—that he wanted to hear, was that [the defendant] and your uncle were in that house, isn't that correct?

[10] Pudlinski also was involved in the murder investigation in 1996, at which time he was a detective with the Connecticut state police.

"A. Yes."

Finally, Caraballo testified that nobody had forced or threatened him to make his statement to the police, nor had anyone promised him anything in exchange for his testimony.[11]

Over the defendant's objection, the trial court admitted Glanville's statement to Caraballo as a declaration against penal interest, pursuant to *State* v. *Schiappa*, 248 Conn. 132, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999). Specifically, the court determined that Glanville was unavailable to testify, by virtue of his having invoked the fifth amendment privilege against self-incrimination, and thereafter concluded that there were "clearly corroborated circumstances that indicate the trustworthiness of this statement." The court stated: "This statement was made to [Glanville's nephew] in a milieu of trust. It was made within five months, I believe, of the incident. The declarant admitted to and incriminated himself to at least the crime of felony murder. If there's any minimizing here, it's one type of murder versus another type of murder. He incriminated himself in this matter, and I think that's what [*Schiappa*] seems to say. And so I'm going to find that [Glanville is] unavailable, that there's corroboration, [and] that the circumstances under which the statement was made were trustworthy, particularly in view of the blood relationship between the declarant [Glanville] and the third party [Caraballo]."

The law regarding out-of-court statements admitted for the truth therein is well settled. "An out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule." (Citation

---

[11] During its deliberations, the only request the jury made was that Caraballo's testimony regarding his conversation with Glanville be read back.

omitted.) *State* v. *Merriam*, 264 Conn. 617, 633, 835 A.2d 895 (2003). Section 8-6 (4) of the Connecticut Code of Evidence carves out an exception to the hearsay rule for an out-of-court statement made by an unavailable declarant if the statement was "trustworthy" and, "at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." Accord *State* v. *Schiappa*, supra, 248 Conn. 148–49 (construing rule 804 [b] [3] of the Federal Rules of Evidence, the federal analog to § 8-6 [4] of the Connecticut Code of Evidence). "In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest." Conn. Code Evid. § 8-6 (4). In the present case, the state offered Glanville's statement to Caraballo as a dual inculpatory statement.[12] We evaluate such a statement using the same criteria. *State* v. *Schiappa*, supra, 153. As with any statement against penal interest, "the trial court must carefully weigh all of the relevant factors in determining whether the statement bears sufficient indicia of reliability to warrant its admission." Id., 154. As we previously have stated, when viewing this issue through an evidentiary lens, we examine whether the trial court properly exercised its discretion. Id., 155.

"Beyond these general evidentiary principles, the state's use of hearsay evidence against an accused in a criminal trial is limited by the confrontation clause of the sixth amendment. In defining the specific limits

---

[12] "A dual inculpatory statement is a statement that inculpates both the declarant and a third party, in this case the defendant." *State* v. *Schiappa*, supra, 248 Conn. 145 n.15.

of the confrontation clause, the United States Supreme Court consistently has held that the confrontation clause does not erect a per se bar to the admission of hearsay statements against criminal defendants. E.g., *Idaho* v. *Wright*, 497 U.S. 805, 813, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990); see also id., 814 ([w]hile a literal interpretation of the Confrontation Clause could bar the use of any out-of-court statements when the declarant is unavailable, [the] Court has rejected that view as unintended and too extreme . . .). At the same time, [a]lthough . . . hearsay rules and the Confrontation Clause are generally designed to protect similar values, [the court has] also been careful not to equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay statements. . . . The Confrontation Clause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule. . . . [Id.]" (Internal quotation marks omitted.) *State* v. *Merriam*, supra, 264 Conn. 633–34.

Traditionally, for purposes of the confrontation clause, all hearsay statements were admissible if (1) the declarant was unavailable to testify, and (2) the statement bore "adequate indicia of reliability." *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). After we heard oral argument in the present case, however, the United States Supreme Court overruled *Roberts* to the extent that it applied to "testimonial" hearsay statements. See *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). In *Crawford*, the court concluded that the "reliability" standard set forth in the second prong of the *Roberts* test is too amorphous to prevent adequately the improper admission of "core testimonial statements that the Confrontation Clause plainly meant to exclude." Id., 63. The court held, therefore, that such *testimonial* hearsay statements may be admitted as

evidence against an accused at a criminal trial only when (1) the declarant is unavailable to testify, and (2) the defendant has had a prior opportunity to cross-examine the declarant. Id., 68.

In so concluding, the court drew a distinction between testimonial hearsay statements and those deemed nontestimonial. "Where *nontestimonial* hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." (Emphasis added.) Id. In other words, nontestimonial hearsay statements may still be admitted as evidence against an accused in a criminal trial if it satisfies both prongs of the *Roberts* test, irrespective of whether the defendant has had a prior opportunity to cross-examine the declarant.

Although the court declined to define the terms "testimonial" and "nontestimonial," it considered three "formulations of th[e] core class of 'testimonial' statements . . . ." Id., 51. The first formulation consists of "ex parte in-court testimony or its functional equivalent— that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . ." (Citations omitted; internal quotation marks omitted.) Id. The second formulation consists of "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . ." (Citations omitted; internal quotation marks omitted.) Id., 51–52, quoting *White* v. *Illinois*, 502 U.S. 346, 365, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992) (Thomas, J., concurring). Finally, the third formulation consists of "statements that were made under circumstances which would lead

an objective witness reasonably to believe that the statement would be available for use at a later trial . . . ." (Citation omitted; internal quotation marks omitted.) *Crawford* v. *Washington*, supra, 541 U.S 52. The court did not adopt any one particular formulation, noting that, "[t]hese formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition— for example, ex parte testimony at a preliminary hearing." Id. Similarly, "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." Id. Therefore, "[w]hatever else the term ['testimonial'] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." Id., 68.

The statement at issue in the present case, however, does not fall within any of the formulations of the core class of testimonial statements discussed by the court in *Crawford*.[13] The statement was not ex parte in-court

[13] The express distinction drawn by the United States Supreme Court in *Crawford* between testimonial and nontestimonial hearsay statements, for purposes of the confrontation clause, is a novel one. In a concurring opinion, Chief Justice Rehnquist noted: "[W]e have never drawn a distinction between testimonial and nontestimonial statements. And for that matter, neither has any other court of which I am aware." *Crawford* v. *Washington*, supra, 541 U.S. 72. Moreover, Chief Justice Rehnquist was particularly concerned that the court's failure in *Crawford* to define expressly the term "testimonial" would create uncertainty "as to what beyond the specific kinds of 'testimony' the Court lists . . . is covered by the new rule." (Citation omitted.) Id., 75. Rather than expressly define the term "nontestimonial," the majority remarked only that business records and statements in furtherance of a conspiracy were hearsay statements "that by their nature were not testimonial"; id., 56; and noted, with approval, that it previously had "considered reliability factors beyond prior opportunity for cross-examination when the hearsay statement at issue was *not testimonial.* See *Dutton* v. *Evans*, [400 U.S. 74, 87–89, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970)]." (Emphasis added.) *Crawford* v. *Washington*, supra, 57. At issue in *Dutton* was the admission

testimony or its functional equivalent; it was not contained in any formalized testimonial materials such as affidavits, depositions or prior testimony. Moreover, the statement was not a confession resulting from custodial examination, and unlike a statement to the police, the circumstances under which the statement was made would not lead an objective witness reasonably to believe that the statement would be available for use at a later trial. Specifically, Glanville made the statement in confidence and on his own initiative to a close family member, almost eighteen months before the defendant was arrested and more than four years before his own arrest. In light of these circumstances, Glanville's communication to Caraballo, his nephew, clearly does not fall within the core category of ex parte testimonial statements that the court was concerned with in *Crawford*. See id., 51 ("[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not"). Accordingly, because this statement was nontestimonial in nature, application of the *Roberts* test remains appropriate.

Under the second prong of *Roberts*, a statement is presumptively reliable if it falls within a "firmly rooted" hearsay exception.[14] *Ohio* v. *Roberts*, supra, 448 U.S. 66. The United States Supreme Court recently has addressed the constitutional framework in which hearsay statements against penal interest may be admitted

of a hearsay statement made by one of the accused's alleged coconspirators to a fellow prisoner. *Dutton* v. *Evans*, supra, 87–89. Because the United States Supreme Court has characterized such a statement as nontestimonial, even though the declarant was in custody when he made the statement, it would follow that the statement in the present case is also nontestimonial.

[14] "Such 'firmly rooted' hearsay exceptions include, for example, the spontaneous utterance exception, the dying declaration exception and the exception for statements made for the purpose of obtaining medical treatment. See *Idaho* v. *Wright*, supra, 497 U.S. 820." *State* v. *Merriam*, supra, 264 Conn. 634 n.23.

into evidence under the second prong of *Roberts*. In *Lilly* v. *Virginia*, 527 U.S. 116, 127, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999), the court recognized that, "due to the sweeping scope of the label, the simple categorization of a statement as a declaration against penal interest . . . defines too large a class for meaningful Confrontation Clause analysis." (Internal quotation marks omitted.) Hence, the court divided statements against penal interest, offered into evidence in criminal trials, into three principal categories: "(1) as voluntary admissions against the declarant; (2) as exculpatory evidence offered by a defendant who claims that the declarant committed, or was involved in, the offense; and (3) as evidence offered by the prosecution to establish the guilt of an alleged accomplice of the declarant." Id. The third category of statements against penal interest was at issue in *Lilly*; id., 130; as it is in the present case.

In *Lilly*, a plurality of the court determined that "this third category of hearsay encompasses statements that are inherently unreliable." Id., 131. Specifically, "th[e] truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination. . . . Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence." (Internal quotation marks omitted.) Id., 132, quoting *Lee* v. *Illinois*, 476 U.S. 530, 541, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986). Accordingly, the plurality concluded that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule . . . ." *Lilly* v. *Virginia*, supra, 527 U.S. 134.

A majority of the court reaffirmed, however, that statements against penal interest nonetheless may be

admitted, consistent with the confrontation clause, under the second prong of *Ohio* v. *Roberts*, supra, 448 U.S. 66, provided that they possess "particularized guarantees of trustworthiness . . . ."[15] (Citation omitted; internal quotation marks omitted.) *Lilly* v. *Virginia*, supra, 527 U.S. 135; see also id., 146 (Rehnquist, C. J., concurring). The plurality further concluded: "[W]hen deciding whether the admission of a declarant's out-of-court statements violates the Confrontation Clause, [appellate] courts should *independently review* whether the government's proffered guarantees of trustworthiness satisfy the demands of the Clause." (Emphasis added.) Id., 137. Accordingly, our review of whether Glanville's statement was sufficiently trustworthy under the confrontation clause is plenary.

The defendant claims that Caraballo's testimony concerning Glanville's statement to him is not sufficiently trustworthy because the statement was not truly against Glanville's penal interest. The defendant further contends that the admission of the statement violated the confrontation clause because the statement itself was presumptively unreliable, and that the state failed to establish that the statement contained particularized guarantees of trustworthiness. In response, the state contends that Glanville's statement was against his penal interest because it implicated him in the crime

---

[15] We note that independent corroborative evidence may not be used to support a statement's particularized guarantees of trustworthiness, "because reliance on such evidence gives rise to an undue risk that presumptively unreliable hearsay evidence will be admitted not on the basis of its inherent reliability but, rather, 'by bootstrapping on the trustworthiness of other evidence at trial . . . .'" *State* v. *Merriam*, supra, 264 Conn. 644, quoting *Idaho* v. *Wright*, supra, 497 U.S. 823; see also *Lilly* v. *Virginia*, supra, 527 U.S. 137–38. In other words, "evidence not directly related to the circumstances surrounding the making of the statement cannot be used to substantiate the statement's trustworthiness." *State* v. *Merriam*, supra, 644. Independent corroborative evidence may be used, nonetheless, "to explain the meaning or import of an *otherwise reliable* hearsay statement." (Emphasis in original.) Id.

of felony murder and three other serious felonies, and that the statement possessed particularized guarantees of trustworthiness sufficient to satisfy the confrontation clause. We agree with the state.

Our independent review of the circumstances under which Glanville made the statement to Caraballo persuades us that the statement was sufficiently reliable to withstand scrutiny under the confrontation clause.[16] First, the statement was squarely against Glanville's penal interest. Glanville admitted his participation in a burglary that had given rise to a homicide, and thus exposed himself to the possibility of a charge of felony murder.[17] As the trial court correctly noted, even if Glanville's statement had attempted to minimize his participation in the homicide, the minimization would have been limited to "one type of murder versus another type of murder." The statement further implicated Glanville as a principal in the crime of burglary, and an accomplice in the crimes of arson and tampering with evidence. Therefore, Glanville's statement exposed him to potential liability for the same types of crimes with which the defendant has been charged and, accordingly, the statement fully and equally implicated both Glanville and the defendant. See State v. Hallum, 585 N.W.2d 249, 255 (Iowa 1998) ("[a]lthough declarations such as 'we killed [him]' could be viewed as an attempt to *share* blame, they could not reasonably be seen as an attempt to *shift* blame away from [the declarant] because [such] assertions [implicate the declarant] fully and equally in the [crime]" [emphasis in original]). Moreover, the fact

[16] We note that the defendant does not contest the trial court's determination that Glanville was unavailable to testify, by virtue of his having invoked the fifth amendment privilege. Therefore, we focus our attention on whether the statement satisfies the other requirements of the hearsay exception for statements against penal interest.

[17] That Glanville *might* have been able to assert an affirmative defense, pursuant to § 53a-54c, does not, as a matter of law, negate the adverse nature of his statement.

that Glanville drove Caraballo to a remote location before making the statement, told Caraballo that he and the defendant had done something wrong and admonished Caraballo not to repeat the statement to anyone clearly establishes that Glanville reasonably could have foreseen that the statement was against his penal interest.

Second, and more important, the blood relationship between Glanville and Caraballo is strongly indicative of the statement's reliability. Caraballo testified at trial that he had known his uncle for a long time, and that their relationship was close. It therefore is significant that Glanville had made his statement, upon his own initiative, to a close family member, and not "in the coercive atmosphere of official interrogation . . . ." *Dutton* v. *Evans*, 400 U.S. 74, 87, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970); see also *United States* v. *York*, 933 F.2d 1343, 1362–63 (7th Cir.) (speaking to acquaintances unconnected to law enforcement makes statements eminently trustworthy), cert. denied, 502 U.S. 916, 112 S. Ct. 321, 116 L. Ed. 2d 262 (1991); cf. *United States* v. *Magana-Olvera*, 917 F.2d 401, 407–408 (9th Cir. 1990) (declarant's statement inculpating defendant in drug trafficking, made after declarant discovered that he sold drugs to undercover police officer, held unreliable). As several courts have recognized, "*Lilly* does not change the fact that statements to close family members have particularized guarantees of trustworthiness." (Internal quotation marks omitted.) *United States* v. *Westmoreland*, 240 F.3d 618, 628 (7th Cir. 2001); id., 627–28; (statements to son trustworthy); see also *United States* v. *Tocco*, 200 F.3d 401, 416 (6th Cir. 2000) (confidential statement to son survives *Lilly* analysis); *State* v. *Yarbrough*, 95 Ohio St. 3d 227, 235, 767 N.E.2d 216 (spontaneous statement trustworthy when made to wife, in declarant's own home, with no state involvement), cert.

denied, 537 U.S. 1023, 123 S. Ct. 533, 154 L. Ed. 2d 433 (2002).

Third, in addition to making the statement to a close family member, Glanville made the statement in confidence and on his own initiative. Such statements are significantly more trustworthy than statements obtained by government agents "for the purpose of creating evidence that would be useful at a future trial." *Lilly* v. *Virginia*, supra, 527 U.S. 125. "*Lilly*'s main concern was with statements in which, as is common in police station confessions, the declarant admits only what the authorities are already capable of proving against him and seeks to shift the principal blame to another (against whom the prosecutor then offers the statement at trial) . . . ." *United States* v. *Shea*, 211 F.3d 658, 669 (1st Cir. 2000), cert. denied, 531 U.S. 1154, 121 S. Ct. 1101, 148 L. Ed. 2d 973 (2001). Neither facing arrest, nor being under arrest, Glanville lacked "[t]he obvious incentive that the captured accomplice in *Lilly* had to shift blame [and curry favor] . . . ." *United States* v. *Papajohn*, 212 F.3d 1112, 1119 (8th Cir. 2000); see also *Lee* v. *Illinois*, supra, 476 U.S. 541 (arrest statements of codefendant strongly suspicious because of strong motivation to implicate defendant and exonerate oneself).

Finally, the timing of Glanville's statement further bolsters its reliability. "In general, declarations made soon after the crime suggest more reliability than those made after a lapse of time where a declarant has a more ample opportunity for reflection and contrivance." (Internal quotation marks omitted.) *State* v. *Lopez*, 254 Conn. 309, 317, 757 A.2d 542 (2000). In the present case, Glanville's statement occurred within five months of the homicide, and preceded the defendant's arrest by almost eighteen months and Glanville's arrest by more than four years. Compare *State* v. *Gold*, 180 Conn. 619, 634, 431 A.2d 501 (confession made within three months

of murders trustworthy), cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980) with *United States v. Satterfield*, 572 F.2d 687, 693 (9th Cir.) (statement made two years after crime lacking in trustworthiness), cert. denied, 439 U.S. 840, 99 S. Ct. 128, 58 L. Ed. 2d 138 (1978). Therefore, in light of all the circumstances, we conclude that the state met its burden of establishing that Glanville's dual inculpatory statement was admissible under § 8-6 (4) of the Connecticut Code of Evidence, and that it bore particularized guarantees of trustworthiness sufficient to satisfy the requirements of the confrontation clause.[18]

The defendant contends, nonetheless, that the statement is rendered untrustworthy by "the circumstances under which [Caraballo] provided the information to the authorities." Specifically, the defendant points out that Caraballo had not revealed Glanville's statements to the authorities until he himself had been arrested, after the start of the defendant's trial. In addition, Caraballo testified at trial that Inspector Pudlinski had stated

---

[18] The defendant further contends that the trial court improperly admitted Glanville's entire statement, instead of only the portions wherein Glanville implicated himself. Specifically, the defendant contends that "several portions of the statement [that] were designed to minimize Glanville's participation in the crime . . . including the segments where Glanville 'covered his face' and 'ran out' of the house, and where Glanville allegedly said the defendant came out of the house and said to him, 'Don't worry, it's straight, it's straight,' should not have been allowed into evidence." We previously have stated that, under our evidentiary law, "where the disserving parts of a statement are intertwined with self-serving parts, it is more prudential to admit the entire statement and let the trier of fact assess its evidentiary quality in the complete context." *State v. Bryant*, 202 Conn. 676, 696–97, 523 A.2d 451 (1987); but see *Williamson v. United States*, 512 U.S. 594, 600–601, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994) (rule 804 [b] [3] of Federal Rules of Evidence "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory"). Because we conclude that Glanville's entire statement was self-inculpatory, exposing him to prosecution for the crimes of felony murder, burglary, arson and tampering with evidence, we also conclude that the trial court properly admitted the statement into evidence in its entirety.

that Caraballo could "help" his uncle by giving Pudlinksi the information he wanted to hear. We previously have concluded, however, that a trial court may not consider the credibility of the testifying witness in determining the trustworthiness of a declaration against penal interest. See *State* v. *Hernandez*, 204 Conn. 377, 391, 528 A.2d 794 (1987). The determination of a witness' credibility is within the province of the jury. *State* v. *Meehan*, 260 Conn. 372, 381, 796 A.2d 1191 (2002); see also *United States* v. *Katsougrakis*, 715 F.2d 769, 777 (2d Cir. 1983) ("to require a preliminary assessment of the in-court witness' credibility would . . . be a usurpation of the jury function"), cert. denied, 464 U.S. 1040, 104 S. Ct. 704, 79 L. Ed. 2d 169 (1984). Moreover, in *Dutton* v. *Evans*, supra, 400 U.S. 88, a plurality of the United States Supreme Court noted: "From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but what he has heard." Accordingly, the trial court properly did not consider the credibility of Caraballo, the in-court witness, before admitting into evidence his testimony concerning Glanville's statement.[19]

---

[19] We are aware that some courts have determined that the credibility of a testifying witness is relevant to the trustworthiness of the statement. See, e.g., *United States* v. *Bagley*, 537 F.2d 162, 167–68 (5th Cir. 1976). As we previously have indicated, however, we follow the approach taken by the Second Circuit Court of Appeals, which has "rejected the position that the credibility of the in-court witness must be evaluated *before* the jury is permitted to hear testimony that inculpates both the out-of-court declarant and the accused." (Emphasis in original.) *State* v. *Hernandez*, supra, 204 Conn. 391 n.7; see also *United States* v. *Katsougrakis*, supra, 715 F.2d 777. Further, while we recognize that the Second Circuit in *Katsougrakis* also concluded that dual inculpatory statements fell within a firmly rooted hearsay exception; *United States* v. *Katsougrakis*, supra, 776; other courts, after *Lilly*, have continued to hold that the credibility of a testifying witness is irrelevant to a determination of the trustworthiness of such a statement. See, e.g., *Padilla* v. *Terhune*, 309 F.3d 614, 620 (9th Cir. 2002).

## II

The defendant next claims that the trial court abused its discretion by improperly refusing to grant a one day continuance to allow him to rehabilitate his alibi witness, Georgianna Cech. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. Cech and the defendant were platonic friends in the fall of 1996, when Cech was living in Ducharme's house. At trial, the defendant called Cech as an alibi witness. Although Cech could not remember the specific date of the victim's murder, she testified that she had been with the defendant on the night that he had made telephone calls from Ducharme's house. According to Cech, she and the defendant had been alone together in Ducharme's house that night, they had cooked dinner together and the defendant was still in the house when she went to bed late. Cech saw the defendant sleeping on a couch the following morning. Cech recalled that the night in question had been "very quiet" in comparison to other evenings at Ducharme's house. She further contradicted the testimony of Rizzi and Ducharme by her testimony that the party, and the argument between Ducharme and Glanville, had occurred on the following night.

On cross-examination, Cech acknowledged that she could not remember the specific dates of the events that she had recounted in her direct testimony. In addition, the state presented her with a sworn, written statement that she had given to the state police in January, 2001, in connection with the present case. According to that statement, Ducharme's party and the argument between Ducharme and Glanville, had occurred on the same night that the defendant had telephoned the university from Ducharme's house. In addition, Cech told the state police that, on that same night, the defendant had left Ducharme's house with Rizzi and Glanville. She

also had stated, consistent with Ducharme's testimony, that, on the following morning, Ducharme had yelled at the defendant for having telephoned the house so early. Under cross-examination, Cech acknowledged that she had given the statement under oath and had agreed to it by signing it. She testified, however, that the statement was false, claiming that she had lied when she had made the statement, that the police had provided her with some of the information contained therein and that she had agreed to the statement because she had wanted the police to leave her house.[20]

Shortly thereafter, the trial court excused the jury so that the parties could present arguments concerning the admissibility of specific portions of Cech's sworn, written statement. Outside the presence of the jury, Cech attempted to explain why she had signed that statement. Specifically, Cech stated: "I'm having a problem saying yes or no to this statement, because they're not truth. It's not how I remember things. It's just I signed this statement to get Inspector Pudlinski out of

[20] The state further explored the inconsistency between Cech's trial testimony and her prior written statement to the state police in the following colloquy, which was heard by the jury:

"[Senior Assistant State's Attorney]: Ms. Cech, the words in this statement you say you agreed to them?

"[Cech]: Yes.

"Q. When you agreed to them, you mean you signed the document?

"A. Yes.

"Q. Did you adopt these words as your own . . . when you signed the document under oath?

"A. No.

"Q. But you signed the document under oath?

"A. Yes.

"Q. Were you intending to mislead a public servant when you signed this document.

"A. No, I was not.

"Q. Then what were you doing when you signed this document?

"A. I wanted Inspector Pudlinski to leave.

"Q. So you wanted him to leave, so you just signed the document?

"A. Yes."

my house, because it was a trick, sir." Upon further questioning by the state, Cech stated that she had been coerced into making the statement. The court subsequently adjourned the proceedings until the following Tuesday, which was five days later.

When the proceedings resumed on March 27, 2001, the court required the state to establish that Cech's prior statement was reliable and had not been coerced. Outside the presence of the jury, the state presented Pudlinski and Steven Looby, a police inspector with the Hartford state's attorney's office, both of whom were present when Cech gave her statement to the police and both of whom testified that the statement had not been coerced. Pudlinski and Looby were subjected to full cross-examination by the defendant. The court thereafter concluded that Cech's statement had been made "voluntarily without any undue pressure . . . ."

At this point, Cech's attorney, Christopher Wall, appeared and informed the court that Cech, who was not in the courtroom, "was under such stress and strain and of such mental state that she didn't feel that she could testify . . . ."[21] Therefore, Wall requested that

---

[21] Specifically, Wall explained that Cech was "in a state . . . that she can't recall what is her independent recollection versus what memories have been basically manufactured or inserted into her head by interviews or statements or different materials that were shown to her over the course of the past several years." Wall further explained that Cech was under stress because she: had witnessed the arrest of her brother, who thereafter had been charged with capital felony murder; had a busy school schedule and already had missed "many days" of school due to her testimony in the case; was a single mother with a three year old daughter; had been in an automobile accident the previous summer; and had sought psychiatric care for anxiety, depression and sleeplessness, and was taking medication for those symptoms.

the trial court vacate the capias[22] that it had issued for Cech earlier that day for her failure to return to court and allow him the opportunity to speak with her and "calm her down" so that she might continue her testimony, voluntarily, on the following day. The court denied this request. The court subsequently released Cech from the capias and instructed Wall to bring her to the courtroom to testify. Shortly thereafter, Wall returned and informed the court that Cech was "downstairs on the first floor and . . . crouched in the corner and . . . unable to come upstairs to testify." The court reissued the capias and, before recessing for lunch, suggested that Wall contact a mental health "outreach team" at Charlotte-Hungerford Hospital.

After lunch, Wall informed the court that a mental health professional was en route to the courthouse. The court subsequently informed the parties that "[a]fter the care professional is through speaking with her, I'm going to order, through her attorney, that she return here tomorrow morning . . . . And you will have an opportunity to speak to the mental health worker[s] and we'll assess her tomorrow morning as well. If it is—if she is being made unavailable intentionally, or because she's ill, we'll make that determination tomorrow morning and see what we should do about her." Later that same day, the court informed the parties that it had "spoken to the crisis intervention team who interviewed . . . Cech downstairs, and they've indicated that she would be unable to testify today, unable to testify tomorrow, in their view. That she's—has some serious problems that have to be looked at from the healthcare point of view. . . . So I will have to decide

---

[22] In a criminal trial, if a witness violates a court order regarding any court appearance, that witness may be taken into custody pursuant to a capias issued by the trial court. See General Statutes § 54-2a (a) (3); see also *State* v. *Lopez*, 239 Conn. 56, 681 A.2d 950 (1996), on appeal after remand, 54 Conn. App. 168, 736 A.2d 157 (1999), aff'd, 254 Conn. 309, 757 A.2d 542 (2000).

tomorrow morning as to how I'm going to react to that with regard to the testimony that she did proffer." The court again released Cech from the capias and allowed her to leave the courthouse with Wall.

The following morning, Cech still was unable to testify. Accordingly, the court presented the parties with two options: either strike Cech's entire testimony, or admit that testimony along with a redacted copy of her prior written statement. The defendant requested a continuance of one day so that he could obtain "a status report" regarding Cech's condition. The court denied the request, and explained: "This case is going to the jury today. And I had two mental health professionals in front of me yesterday who interviewed [Cech] . . . . They said that this woman could not testify today, yesterday she was gasping for air, she couldn't speak, she's under three medications. They think she has to be—she has to see a psychiatrist and get more intensive treatment and that she has to take perhaps more—alter or increase her medications. I said when will she be ready. They said they had no idea, it's a process. I said what about tomorrow, being today. No way. No way. They said this is not a short-term, quick fix situation for this witness." Defense counsel remarked that he had not been present at that meeting, and requested an opportunity to question the mental health professionals. In response, the court asked him why he had not made this request the previous day, "so you could have done it last night." The court further stated: "I said it on the record yesterday, essentially the same thing. I just embellished a little more." The court then denied the defendant's request for a continuance. The defendant thereafter moved for a mistrial, and reiterated his request for "a delay of a few days to determine . . . whether [Cech] can complete [her testimony] so the jury has a full picture of her testimony, and the reasons she's not here, to complete it." The

court again refused to continue the case, and denied the defendant's request for a mistrial. Thereafter, the court instructed the jury that Cech would no longer be testifying due to reasons beyond the control of the court and the parties,[23] and it admitted portions of Cech's prior written statement into evidence.

Our discussion of the defendant's second claim begins with our well settled law that "[t]he determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . . A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . To prove an abuse of discretion, an appellant must show that the trial court's denial of a request for a continuance was arbitrary. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. . . . State v. Berube, 256 Conn. 742, 759, 775 A.2d 966 (2001). In addition, we consistently have acknowledged that [o]ur role as an appellate court is not to substitute our judgment for that of a trial court that has chosen one of many reasonable alternatives." (Internal quotation marks omitted.) State v. Coney, 266 Conn. 787, 801, 835 A.2d 977 (2003).

[23] Regarding Cech's absence from the trial, the court instructed the jury as follows: "Ladies and gentlemen, at this point in time I'm going to focus your attention on the witness we had some days back . . . . For reasons beyond our control, and I mean beyond my control, defense counsel's control, the prosecutor's control, [Cech] will no longer be testifying in this case. The testimony that she has given thus far, of course, is in evidence before you. And the state has offered, and we've accepted into evidence, a statement from . . . Cech, and that—that will be the end of her involvement in this particular case."

The defendant contends that the trial court arbitrarily refused to grant a continuance in order to allow Cech possibly to continue her testimony, and that this refusal substantially impaired the defendant's constitutional right to put on a defense at trial.[24] "We have articulated a number of factors that appropriately may enter into an appellate court's review of a trial court's exercise of its discretion in denying a motion for a continuance. Although resistant to precise cataloguing, such factors revolve around the circumstances before the trial court at the time it rendered its decision, including: the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; [and] the defendant's personal responsibility for the timing of the request . . . ." (Internal quotation marks omitted.) Id., 801–802.

In the present case, the defendant requested a continuance of one day in order to obtain a status report of Cech's mental health and her ability to testify. As we previously have noted, the trial court met with two mental health professionals, outside the presence of the parties, who told the court that, in their assessment, Cech's condition was "not a short-term, quick fix situation," and that "they had no idea" when she might be able to testify. Although we do not approve of the court's ex parte meeting with the mental health professionals, we note that the court stated the substance of that meeting for the record shortly after that meeting

[24] Although the defendant contends that the trial court's denial of a continuance implicates the "constitutional guarantees of due process," the defendant has framed his claim under the abuse of discretion standard of review. Because the defendant has failed to conduct an independent constitutional analysis of the claim, we review it only for abuse of discretion.

had occurred, and nothing precluded either party from contacting those individuals. Therefore, in the absence of a claim that the trial court somehow misrepresented the substance of that ex parte meeting, we cannot say that the court's denial of the requested continuance constituted an abuse of discretion. The court based its decision upon a professional medical opinion that Cech would not have been able to testify within the next day, and that her participation in the trial beyond that date was also in question. Without any evidence to the contrary, the defendant's contention that a continuance of "one day" or "a few days" would have allowed Cech to finish her testimony was merely speculative. As we previously have stated, "a trial court does not act arbitrarily or unreasonably when it denies a motion for a continuance that is supported by mere speculation." *State* v. *Delgado*, 261 Conn. 708, 714–15, 805 A.2d 705 (2002).

Moreover, the defendant failed to establish that any further testimony provided by Cech upon redirect examination would have been anything other than cumulative of her previous testimony. Cech already had testified that the defendant had been with her on the night of the murder, and her direct testimony contradicted the testimony of witnesses for the state. Furthermore, although Cech did not have the opportunity, upon redirect examination, to explain the inconsistencies between her trial testimony and her prior written statement, she had explained that the police had provided her with the information in that prior statement and that she had signed the statement solely because she had wanted Inspector Pudlinski to leave her house. The defendant did not present the court with any indication that Cech, upon redirect examination, would have provided any further explanations for the inconsistency other than those that already had been heard by the jury. Accordingly, the trial court did not abuse its discre-

tion in denying the defendant's motion for a continuance.

## III

We turn now to the defendant's final claim, namely, that the trial court improperly denied his request for a mistrial. "The standard for review of an action upon a motion for a mistrial is well established. While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Higgins*, 265 Conn. 35, 75–76, 826 A.2d 1126 (2003).

The defendant claims that the trial court abused its discretion in denying the mistrial, and that he was prejudiced substantially as a result because Cech was his sole alibi witness. As we previously have stated, however, Cech completed her entire direct examination, affording the defendant the opportunity to present his defense, and, on cross-examination by the state, Cech explained the reasons for her prior inconsistent statement to the police. We therefore cannot say that the trial court abused its discretion in denying the defendant's

request for a mistrial, or that the defendant incurred substantial prejudice as a result.

The judgment is affirmed.

In this opinion the other justices concurred.