STATE OF CONNECTICUT *v.* MIGUEL ESTRELLA
(SC 17188)

Sullivan, C. J., and Borden, Katz, Palmer and Zarella, Js.

Argued November 23, 2005—officially released March 21, 2006

*George G. Kouros*, special public defender, with whom were *Cyd O. Fremmer* and, on the brief, *Richard A. Reeve* and *Michael O. Sheehan*, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Miguel Estrella, was charged with murder in violation of General Statutes § 53a-54a,[1] felony murder in violation of General Statutes § 53a-54c,[2] conspiracy to commit murder in violation of Gen-

---

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] General Statutes § 53a-54c provides: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was

eral Statutes §§ 53a-48 (a)[3] and 53a-54a, and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (2).[4] The state's case rested almost entirely on two pieces of evidence: (1) a transcript of the hearing in probable cause testimony of an accomplice, Jonathan Rivers, who, subsequent to the hearing, sent to the defendant a letter that the jury was not permitted to see, ostensibly recanting that testimony, and who asserted his fifth amendment right not to testify at the defendant's trial; and (2) a tape of secretly recorded conversations between the defendant and his prison cellmate, Wayne Williams, who was deported out of the country prior to the state's disclosure of the recordings to the defendant, thereby rendering Williams unavailable to the defendant for pretrial investigation or cross-examination at trial.

After a jury trial, the defendant was convicted as charged, and, thereafter, pursuant to General Statutes § 51-199 (b) (3),[5] he directly appealed from his judgment

armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[3] General Statutes § 53a-48 provides: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[4] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . . Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

[5] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony,

of conviction to this court. He claims that the trial court improperly: (1) permitted the state, in violation of his federal constitutional rights of confrontation and to due process,[6] to submit as evidence Rivers' probable cause hearing testimony despite the fact that the letter written by Rivers recanting that testimony was not available for impeachment purposes; (2) precluded the defendant from impeaching Rivers' probable cause testimony with that letter in violation of his federal constitutional right of confrontation; and (3) denied the defendant's motion to suppress the tape recordings of his conversations with Williams, thereby depriving the defendant of his state constitutional right to due process and his state and federal constitutional rights to compulsory process.[7] We reject these claims, and, accordingly, we affirm the judgment of the trial court.

The record reflects the following undisputed facts and procedural history.[8] At the defendant's hearing in probable cause,[9] the state's key witness was Rivers, a

or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[6] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The sixth amendment right of confrontation was made applicable to the states through the due process clause of the fourteenth amendment; *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); which provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ." U.S. Const., amend. XIV, § 1.

[7] Article first, § 8, of the constitution of Connecticut, provides in relevant part that "[n]o person shall . . . be deprived of life, liberty or property without due process of law" and that, "[i]n all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf . . . ."

[8] The facts specifically relevant to Williams' testimony are set forth in part II of this opinion.

[9] A hearing in probable cause is a legal prerequisite to the prosecution of any crime punishable by death or life imprisonment. See Conn. Const., art. I, § 8; General Statutes § 54-46.

codefendant and an admitted drug dealer, who, over the course of two days, offered the following testimony. On July 21, 2000, the defendant ordered Rivers and another associate, Bobby Marrow, to meet the victim, Juan Disla, another drug dealer, at the Dairy Queen in Meriden, ostensibly to purchase cocaine. The defendant, who had placed an order for cocaine with Disla the day before, instructed Marrow and Rivers to hijack Disla's van and to rob him of his cocaine. When Disla appeared at the Dairy Queen, Marrow approached Disla's van, pointed a gun at him and ordered him into the back seat. As Rivers drove Disla's van, Marrow bound Disla with duck tape and shot him in the leg. Marrow then telephoned the defendant seeking further instructions. As the defendant had ordered, River and Marrow met with the defendant at the home of Lawrence Smith. After the defendant and Smith conferred, all of the men left Smith's home and, with the defendant and Marrow leading in Disla's van and Smith and Rivers following in Smith's truck, drove to a wooded area. There, the defendant and Marrow removed Disla from the van and placed him on the ground. Smith and the defendant then took more than two kilograms of cocaine from Disla's van. Although Rivers had not observed much of what happened in the wooded area, before leaving the area, he did notice Disla's motionless body under a tree.

Rivers further testified that later that evening, he, Marrow, the defendant and two women, Sandra Rodriguez and Leslie Torres, drove in Disla's van to New York, where they abandoned it. Although Rivers did not know what had happened to Disla's body, he testified that he saw a bonfire in the backyard of the defendant's home, destroying what he believed to be some of Disla's clothing.

Rivers explained that, on the day of the robbery, there had not been any discussion of killing or robbing Disla and that he was in fact surprised when Marrow shot

Disla while they were in the van. Rivers never confronted Marrow about the shooting because he was afraid of Marrow, who had a reputation for being a "cold-blooded killer." Rivers admitted that he had not seen anyone actually kill Disla and that he did not know if Disla was dead when he left the wooded area and returned to Meriden.

At the probable cause hearing, the defendant questioned at length Rivers' ability to see what actually had happened to Disla in light of the fact that, for most of the time, Rivers admitted that he was 300 yards away from Disla and had his back turned away. The defendant also explored inconsistencies between Rivers' earlier statement to the police and his testimony at the hearing in probable cause regarding Rivers' drug and alcohol ingestion on the day in question. Finally, the defendant introduced a written agreement between Rivers and the state in which the state had promised to recommend that, in exchange for his testimony against the defendant, the state would dispose of all the criminal cases pending against Rivers,[10] to recommend to the court that Rivers be sentenced to a period of incarceration of twenty years, execution suspended after a period of five to ten years, and to ensure that Rivers and the defendant would be housed in separate correctional facilities. Rivers acknowledged that the leniency of his sentence would depend on the effectiveness of his testimony against the defendant in helping the state to attain the defendant's conviction.

At the time of trial, Disla's body had not been recovered, and, despite a thorough search of the crime scene and extensive forensic testing, there was no physical or forensic evidence to corroborate the state's theory

---

[10] The cases pending against Rivers when he first provided his statement to the police in February, 2001, included a charge of robbery in the first degree that was unrelated to the events surrounding Disla's death.

of the case. During the state's case-in-chief, when called as a witness, Rivers invoked his fifth amendment right to remain silent. Thereafter, the state introduced Rivers' testimony from the probable cause hearing without objection. Immediately at the conclusion of the reading of that testimony into the record, the court provided the jury with the stipulation that Rivers originally had been charged in this case with kidnapping in the first degree, assault in the first degree, and conspiracy to commit murder, that he had been charged separately in another case with robbery in the first degree, and that he faced a total maximum penalty of eighty-five years incarceration.

During the course of the defendant's case at trial, the defendant attempted to introduce into evidence a letter written to him by Rivers in which Rivers purported to recant his probable cause hearing testimony.[11] The letter was postmarked June 5, 2003, and was written while the defendant was awaiting trial in this case. The state objected to admission of the letter, claiming that it was unreliable. The court excluded the letter from evidence, agreeing with the state that it was unreliable, but allowed the defendant to identify the letter for the jury as corroboration for his claim that Rivers had attempted to contact him in June, 2003. Later, when the defendant began to testify regarding whether Rivers ever had told him why he had testified to certain things at the probable cause hearing, the trial court modified its earlier decision, permitting the defendant to testify that Rivers had apologized to him for having lied in that testimony.[12]

---

[11] The portion of the letter that the defendant sought to have admitted into evidence provided as follows: "But God had to get our attention somehow, even if it was through these lies that were made up because I don't know if you knew or not but I personally refused to get up there and lie about something that didn't happen to me. I believe that it was more than I—more that I didn't think that you would lie, but two wrongs don't make a right. So, from the bottom of my heart, I'm sorry."

[12] In allowing this limited testimony, the trial court explained: "Okay. For the record, I have discussed with counsel a problem, and I am modifying

As a consequence, the defendant was able to testify that, on several occasions, Rivers had recanted his probable cause hearing testimony and had apologized for having lied.[13] The defendant also testified that, although he had participated in the July 21, 2000 events, he had done so under duress in response to express and implied threats from Marrow and Smith. Thereafter, the jury returned a verdict of guilty on all charges, and the trial court rendered judgment in accordance with the verdict. This appeal followed.

## I

On appeal, the defendant raises two claims in relation to Rivers' letter.[14] First, he contends that, by allowing

my ruling to this extent: [*State* v. *Valentine*, 240 Conn. 395, 404–405, 692 A.2d 727 (1997), appeal after remand, 255 Conn. 61, 762 A.2d 1278 (2000)] . . . stands for the proposition that if a witness has testified in a certain way, and that witness at a later time told someone that testimony is not true, [then] that does come in on the issue of credibility of that particular witness. So, therefore, [defense counsel], you know what the parameters are."

[13] The following exchange ensued between the defendant and defense counsel on this issue:

"Q. I believe you testified . . . that you spoke with [Rivers] on many occasions since he testified in the hearing in probable cause, correct?

"A. Yes.

"Q. Did he say anything to you about that probable cause hearing? . . .

"A. Yeah, he said he lied.

"Q. How many times did he tell you that?

"A. In writing or just on the phone?

"Q. On the phone.

"A. At the beginning, because there was a period after the hearing that we wouldn't talk because he got out, but once we start communicating, that was like the first few letters and phone calls, that's how it was.

"Q. Okay. Did he say anything else about his lying in the hearing in probable cause?

"A. In terms of?

"Q. Did he exhibit any remorse?

"A. Oh, yeah, yeah, yeah, yeah, saying that he was sorry."

[14] The other key piece of the state's evidence at trial was the tape-recorded conversations with Williams in which the defendant admitted his participation in the murder in graphic detail. Facts pertinent to that evidence are set forth in part II of this opinion and are not factored into the harmless error analysis conducted in the part I B of this opinion.

into evidence Rivers' probable cause hearing testimony, the court violated his constitutional right of confrontation because, at that hearing, the defendant had not had the opportunity to cross-examine Rivers about the letter that Rivers subsequently wrote admitting that he had lied at the probable cause hearing. Second, the defendant claims that the trial court's decision to preclude him from introducing Rivers' letter in which Rivers made that admission deprived him of his confrontation and due process rights. We disagree.

A

The defendant concedes that he never objected at trial to the introduction into evidence of Rivers' hearing testimony, and therefore seeks, under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), to prevail on his claim that his opportunity for cross-examination of Rivers was not constitutionally adequate.[15] We conclude that the claim is reviewable, but that the defendant ultimately cannot prevail.

As an initial matter, we note that, with respect to the question of whether the circumstances under which an out-of-court statement was obtained satisfied the requirements of the confrontation clause, our review is plenary. See *State* v. *Rivera*, 268 Conn. 351, 367, 844 A.2d 191 (2004). We recently had the opportunity to address in detail what the sixth amendment to the

---

[15] "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Citation omitted; internal quotation marks omitted.) *State* v. *Samuels*, 273 Conn. 541, 556–57, 871 A.2d 1005 (2005).

United States constitution requires before hearsay evidence may be admitted.

"Beyond [the] general evidentiary principles [requiring the trustworthiness and reliability of out-of-court statements], the state's use of hearsay evidence against an accused in a criminal trial is limited by the confrontation clause of the sixth amendment. In defining the specific limits of the confrontation clause, the United States Supreme Court consistently has held that the confrontation clause does not erect a per se bar to the admission of hearsay statements against criminal defendants. E.g., *Idaho* v. *Wright*, 497 U.S. 805, 813, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990); see also id., 814 ([w]hile a literal interpretation of the [c]onfrontation [c]lause could bar the use of any out-of-court statements when the declarant is unavailable, [the] [c]ourt has rejected that view as unintended and too extreme . . . ). At the same time, [a]lthough . . . hearsay rules and the [c]onfrontation [c]lause are generally designed to protect similar values, [the court has] also been careful not to equate the [c]onfrontation [c]lause's prohibitions with the general rule prohibiting the admission of hearsay statements. . . . The [c]onfrontation [c]lause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule. . . .

"Traditionally, for purposes of the confrontation clause, all hearsay statements were admissible if (1) the declarant was unavailable to testify, and (2) the statement bore adequate indicia of reliability. *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). . . . [In *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 354, 158 L. Ed. 2d 177 (2004)] however, the United States Supreme Court overruled *Roberts* to the extent that it applied to testimonial hearsay statements. . . . In *Crawford*, the court concluded that the reliability standard set forth in the second prong of the

*Roberts* test is too amorphous to prevent adequately the improper admission of core testimonial statements that the [c]onfrontation [c]lause plainly meant to exclude. . . . The court held, therefore, that such *testimonial* hearsay statements may be admitted as evidence against an accused at a criminal trial only when (1) the declarant is unavailable to testify, and (2) the defendant has had a prior opportunity to cross-examine the declarant. . . .

"In so concluding, the court drew a distinction between testimonial hearsay statements and those deemed nontestimonial. Where *nontestimonial* hearsay is at issue, it is wholly consistent with the [f]ramers' design to afford the [s]tates flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from [c]onfrontation [c]lause scrutiny altogether. . . . In other words, nontestimonial hearsay statements may still be admitted as evidence against an accused in a criminal trial if it satisfies both prongs of the *Roberts* test, irrespective of whether the defendant has had a prior opportunity to cross-examine the declarant." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Rivera*, supra, 268 Conn. 361–63.

Thus, although the issue as to both testimonial and nontestimonial statements is one of reliability, the focus of the court's inquiry is different. *Crawford* v. *Washington*, supra, 541 U.S. 61–63. With respect to nontestimonial statements, which do not implicate the confrontation clause, the focus remains on substantive reliability and other general evidentiary concerns. With respect to testimonial statements, however, the constitution implicates an additional concern—procedural reliability, namely, whether cross-examination has provided a procedural safeguard to the right of confrontation. Id., 61 ("the [confrontation] [c]lause's ultimate goal

is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee").

"Although the court declined to define the terms testimonial and nontestimonial, it considered three formulations of th[e] core class of testimonial statements . . . . The first formulation consists of ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . . The second formulation consists of extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . . Finally, the third formulation consists of statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . . The court did not adopt any one particular formulation, noting that, [t]hese formulations all share a common nucleus and then define the [confrontation] [c]lause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, ex parte testimony at a preliminary hearing. . . . Similarly, [s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard. . . . Therefore, [w]hatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the [c]onfrontation [c]lause was directed." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, supra, 268 Conn. 363–64.

Turning to the present case, the framework set forth in the preceding paragraphs demonstrates that the defendant's claim that the admission of Rivers' probable cause testimony abridged his right to confront the witness against him actually implicates an analysis of only one prong of the test. Specifically, it is undisputed that Rivers' testimony was testimonial in nature, and as a "testimonial" hearsay statement, that testimony falls under the general rubric of *Crawford* v. *Washington,* supra, 541 U.S. 68, which held that, "[w]here testimonial evidence is at issue . . . the [s]ixth [a]mendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Therefore, based on *Crawford,* in order for Rivers' testimony to have been admitted properly, he must have been unavailable at the time of trial, and the defendant must have had a prior opportunity to cross-examine him regarding the details of his testimony.

It is undisputed that Rivers' invocation of his fifth amendment right to silence rendered him unavailable; *State* v. *Munoz,* 233 Conn. 106, 137, 659 A.2d 683 (1995); and, therefore, the focus of our inquiry is on the second step in the analysis. The defendant contends that his opportunity for cross-examination of Rivers at the probable cause hearing was inadequate. We disagree.

Although *Crawford* expanded to all testimonial statements the constitutional rule that a defendant must be afforded the right of cross-examination, that case did not portend to alter the preexisting case law as to what that right entails. See *Malone* v. *Stewart,* United States District Court, Docket No. CV-01-2099-PHX-NVW (D. Ariz. September 23, 2005) p. 14 ("[P]rior 'in-court' statements have never been admissible unless the defendant had adequate opportunity to cross-examine the declarant at the earlier 'in-court' proceeding. See *Crawford* [v. *Washington,* supra, 541 U.S. 57] [noting development of the rule in *Mattox* v. *United States,* 156 U.S. 237, 5

S. Ct. 337, 39 L. Ed. 409 (1895)].").. As we have stated often, "[t]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Citations omitted; internal quotation marks omitted.) *State* v. *Andrews*, 248 Conn. 1, 11, 726 A.2d 104 (1999).

"Although it is within the trial court's discretion to determine the extent of cross-examination . . . the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment." *State* v. *Colton*, 227 Conn. 231, 249, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). "The right of confrontation is preserved [however] if defense counsel is permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Internal quotation marks omitted.) Id. "[B]y testing in the crucible of cross-examination"; *Crawford* v. *Washington,* supra, 541 U.S. 61; the testimonial evidence at issue, the defendant is afforded his sixth amendment constitutional rights.

As the defendant in the present case never objected at trial to the introduction into evidence of Rivers' hearing

testimony, the trial court was not asked to evaluate whether the defendant's cross-examination of Rivers was constitutionally adequate. Because that inquiry involves a question of law, and because "any limitation on the impeachment of a key government witness is subject to the most rigorous appellate review"; *State* v. *Colton*, supra, 227 Conn. 250; we scrutinize the testimony to make that determination. Our review of the defendant's cross-examination of Rivers at the probable cause hearing supports the propriety of the trial court's admission of Rivers' hearing testimony.

Looking to whether the defendant had a sufficient opportunity to undermine and to discredit Rivers' testimony, we note that the defendant elicited through cross-examination that Rivers was a drug dealer and that the state had promised him that it would reduce charges against him and recommend what was essentially a minimal sentence of incarceration when compared with the gravity of the criminal charges. The defendant also elicited that Rivers never had seen the actual killing and questioned him regarding his impaired ability to see Marrow's actions. Finally, the defendant explored inconsistencies between Rivers' testimony and his initial statement to the police. Indeed, no restrictions were placed on the defendant's ability to cross-examine Rivers at the probable cause hearing. See *State* v. *Bryant*, 71 Conn. App. 488, 493–94, 802 A.2d 224 (concluding trial court properly admitted probable cause hearing testimony when defendant was not limited in ability to cross-examine), cert. denied, 261 Conn. 939, 808 A.2d 1133 (2002). Indeed, to the extent that the defendant wanted to elicit evidence supporting his duress defense, we note that Rivers testified on cross-examination that Marrows was known as a "cold-blooded killer" whom he feared.

Measuring the defendant's ability to cross-examine Rivers on matters affecting his reliability and credibility

in order to comport with the constitutional standards embodied in the right to cross-examine; *State* v. *Ortiz*, 198 Conn. 220, 224, 502 A.2d 400 (1985); we are satisfied that the defendant was provided the requisite procedural safeguard to the right of confrontation. *Crawford* v. *Washington*, supra, 541 U.S. 61. Accordingly, we conclude that the defendant had a more than adequate and full opportunity to cross-examine Rivers both generally and specifically to address whether Rivers was giving truthful testimony.

The only question remaining is whether the defendant's obvious inability to cross-examine Rivers regarding statements made in the letter ostensibly retracting that probable cause testimony, because that letter did not exist at the time of the hearing, undermines our conclusion that the defendant's opportunity to cross-examine Rivers was constitutionally adequate. We conclude that it does not. First, *Crawford* does not address whether evidence that did not exist at the time of the prior opportunity for cross-examination can somehow render that opportunity inadequate and therefore render the prior testimony inadmissible. Even if we were to assume without deciding that such evidence is relevant to the adequacy of the prior cross-examination, we nevertheless conclude that the letter, which we address at greater length in part I B of this opinion, did not introduce any new evidence. The letter did not provide specific details of the crime, the whereabouts of the participants or other information that previously had not been explored fully. The credibility of Rivers' testimony was always at issue, and, as long as the defendant had the ability to scrutinize his testimony at the hearing, his constitutional rights were protected. Accordingly, "[w]e thus decline to adopt the defendant's position that the equivalent of significant cross-examination can take place at a preliminary hearing only when a defendant's opportunity to cross-examine is

identical to that afforded at trial." (Internal quotation marks omitted.) *State* v. *Outlaw*, 216 Conn. 492, 508, 582 A.2d 751 (1990).

The cases on which the defendant relies are not to the contrary. In those cases, subsequent to the hearing in which the challenged testimony had been given, the defendant learned of evidence demonstrating facts that could have been used to impeach the witness' testimony, but the defendant had no basis for knowing those facts at the time of the hearing. See, e.g., *People* v. *McCambry*, 218 Ill. App. 3d 996, 1001–1002, 578 N.E.2d 1224 (defendant unaware of suggestive lineup from which accuser identified defendant at time accuser testified at preliminary hearing), cert. denied, 142 Ill. 2d 661, 584 N.E.2d 136 (1991); *People* v. *Reed*, 98 Misc. 2d 488, 488–90, 414 N.Y.S.2d 89 (1979) (defendant deprived of adequate opportunity at preliminary hearing to cross-examine person who accused him of robbery when accuser died four days before indictment was filed, victim's death certificate listed cause of death as chronic alcoholism and that condition was not known to defendant at time of hearing); *Commonwealth* v. *Bazemore*, 531 Pa. 582, 588–89, 591, 614 A.2d 684 (1992) (prior testimony of unavailable witness not admissible at trial when defendant unaware at time of preliminary hearing that witness accuser had made prior inconsistent statement to police, that witness had criminal record, and that district attorney was, at that time, contemplating filing criminal charges against witness for homicide and conspiracy in connection with same incident giving rise to complaint against defendant). Here, by contrast, the defendant knew better than anyone else whether Rivers was lying about the defendant's conduct and thus readily could have challenged his credibility even without the letter. We, therefore, conclude that the trial court properly admitted into evi-

dence at the trial Rivers' transcribed testimony at the probable cause hearing.

## B

The defendant next challenges the trial court's refusal to allow into evidence Rivers' letter. The defendant asserts that this decision, based upon the court's determination that the letter was unreliable, was improper because he was not using the letter for substantive purposes, but, rather, to impeach Rivers' probable cause testimony. Consequently, according to the defendant, the trial court deprived him of his constitutional right to confront Rivers and his due process right to a fair trial. We conclude that the letter should have been admitted into evidence as appropriate impeachment evidence of Rivers' testimony at the probable cause hearing. "The purpose of impeaching the credibility of a hearsay declarant is merely to show that he or she talked one way at one point in time and a different way on a previous occasion, which could give rise to a doubt as to the truthfulness of both statements. See *State* v. *Saia*, 172 Conn. 37, 45, 372 A.2d 144 (1976) (witness talking one way on witness stand and another way previously raises doubt as to truthfulness of both statements); see also *State* v. *Moales*, 41 Conn. App. 817, 822, 678 A.2d 500, cert. denied, 239 Conn. 908, 682 A.2d 1011 (1996)." *State* v. *Pare*, 75 Conn. App. 474, 480, 816 A.2d 657, cert. denied, 263 Conn. 924, 823 A.2d 1216 (2003). We need not determine, however, whether the trial court's exclusion of the letter constituted an impropriety of constitutional magnitude, requiring the state to prove the error harmless beyond a reasonable doubt, because it is clear that the state can and indeed has more than satisfied that burden.

At trial, over the state's objection, the court allowed the defendant to testify that Rivers had told him, on several occasions on the telephone, that he had lied at

the probable cause hearing, and that he was sorry for having done so. Therefore, the jury had before it evidence that Rivers had expressed his remorse for having lied. Indeed, the defendant's characterization of Rivers' statements as a recantation of and apology for his probable cause hearing testimony would have been far less clear from the letter itself had it been admitted as a exhibit. See footnote 11 of this opinion. Additionally, although the court did not allow the letter into evidence, the court did allow the defendant to identify for the jury a piece of paper with writing on it, ostensibly the letter, along with the envelope it came in, which had been marked for identification, and to identify it as a letter written by Rivers to him, to corroborate the defendant's claim that Rivers had indeed attempted to contact him while he was awaiting trial. Therefore, although admission of the letter might have contributed further to impeach Rivers' credibility, the jury did have the salient impeachment evidence before it. The slight additional amount of inconsistent statements contained in the letter was merely cumulative.

Significantly, we note that, although there was no physical evidence linking the defendant to the crimes, in furtherance of his theory of defense and consistent with his failure to object to the admission of Rivers' testimony, the defendant testified to his participation in the crimes and largely corroborated the significant elements of the robbery, murder and destruction of evidence.[16] Specifically, the defendant claimed that Marrow had set up the robbery, that Marrow and Smith were the ones who had decided to kill Disla and that he had participated under duress. The defendant testified that he participated in the crimes because Marrow and Smith were cold-blooded killers who impliedly had

---

[16] We note that the defendant never asserted at trial or before this court that the trial court's ruling affected his decision as to his theory of defense or as to whether to testify in his own behalf.

threatened him and explicitly had threatened Rivers, whom he thought of as a "little brother." He admitted that he had placed the telephone call to Disla that began the tragic events and that he had assisted in the destruction of Disla's body, in the disposal of the van and in the destruction of Disla's clothing and personal effects. In particular, he admitted that: he drove the van into the woods after Disla had been shot but was still alive; he drove the van to New York and removed the license plate; and he brought more than twenty gallons of acid to Smith while Smith was destroying Disla's body.

Finally, Rodriguez also testified and corroborated the fact that the defendant had led the effort to dispose of the van, the license plate and the contents of the van. According to Rodriguez, the defendant gave orders to the other men on the way to New York and, once they arrived, removed the license plate from the van and gave the keys to three other men who then drove it away. Additionally, on the way home, the defendant stopped at a gas station, where he discarded a black garbage bag in a dumpster. In light of the overwhelming evidence of the defendant's guilt, the trial court's decision precluding the admission of Rivers' letter into evidence, which was cumulative at best, was harmless beyond a reasonable doubt.

## II

The last issue on appeal involves the tape-recorded conversations with Williams, the defendant's cellmate, who was deported before the defendant had knowledge of his cooperation. The record discloses the following additional facts.

In September, 2000, Williams, a legal alien and a native of Jamaica, was in federal custody for drug violations. On September 8, 2000, the defendant was arrested on an unrelated federal drug charge. Williams subsequently approached federal authorities, offering infor-

mation about statements the defendant had made to him regarding Disla's murder. As a consequence, members of the Federal Bureau of Investigation, the United States Attorney's Office, and the federal Organized Crime Drug Enforcement Task Force interviewed Williams, who thereafter agreed to wear a recording device and converse with the defendant. On October 4, 2000, while they were incarcerated at the Hartford correctional center, Williams wore the device and taped his conversations with the defendant. As result of his cooperation, when he was sentenced on April 11, 2001, Williams received a significant downward departure from the federal sentencing guidelines. He was sentenced to time served and placed on probation for four years, with the understanding that he could be deported. On June 6, 2001, Williams appeared for a hearing before an administrative judge of the Immigration and Naturalization Service because of his federal drug felony conviction. The judge ordered that Williams be deported to Jamaica.

In the tape recordings, which were nearly five hours in length, the defendant portrayed himself as a leader and active participant in Disla's murder. He told Williams that he had plotted the murder in order to gain respect from Disla, who had been cheating him in their drug dealings. The defendant set up the meeting at Dairy Queen expecting Marrow and Rivers to rob Disla. He did not want there to be any bloodshed, but, when Marrow shot Disla "for fun," the defendant instructed Rivers and Marrow to follow him to Smith's house, where the defendant told Smith to "get rid of [Disla]." The defendant provided details of the car ride to the wooded area and how they had killed Disla by suffocation. He recounted in lengthy and harrowing detail how he and Smith had destroyed the body, first by dismembering it and then burning it with acid. During the conversations, the defendant repeatedly took credit for the

murder, claiming that he was the leader who had set up the robbery, brought Disla to Smith, decided how to kill him and how to dispose of the body and personal effects.

Because Williams had been deported prior to the defendant's knowledge or receipt of the tape recordings, and neither the state nor the federal government knew of Williams' whereabouts after his deportation, the defendant could not cross-examine Williams about the circumstances surrounding their creation. Accordingly, the defendant moved to suppress the tape recordings and to dismiss the charges, claiming that his rights to due process and compulsory process had been violated. Following extensive argument and the submission of lengthy briefs on the issues, the trial court denied both motions after applying the balancing test set forth by this court in State v. Morales, 232 Conn. 707, 719–20, 657 A.2d 585 (1995). Specifically, the court found that the defendant had failed to establish any bad faith on the part of the state or the federal government in deporting Williams and to demonstrate that Williams' testimony would have been favorable to him.

The defendant challenges the trial court's denial of the motions claiming that, because part of the defense theory of the case was that the defendant's statements to Williams were exaggerations meant to make him appear tough to further protect himself while incarcerated, and that he made the statement to Williams only after Williams had warned him about the need to appear tough so as not to be victimized by the other inmates, Williams' unavailability left the defendant unable independently to corroborate his theory of defense. The defendant claims that as a consequence of the court's decisions, his rights to due process under the state constitution and compulsory process under the state and federal constitutions were violated. Although we are mindful that the state is under an obligation to

preserve and to provide evidence to the defendant, under the facts of this case, we are satisfied that the defendant's state and federal constitutional rights were not violated.

A

We begin with the standard by which we determine whether the defendant's state constitutional rights to due process were violated. Under both the state and the federal constitution, the state's failure to provide evidence within its control to a criminal defendant may violate the defendant's right to due process of law in two types of situations. Id., 714. The first situation concerns the state's withholding of exculpatory evidence. Id. The second situation, and the one at issue in this case, concerns the failure of the police to preserve evidence that might be useful to the accused. Id.

Prior to the decision of the United States Supreme Court in *Arizona* v. *Youngblood*, 488 U.S. 51, 57–58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), wherein the court held that "bad faith" on the part of the government was necessary in order to establish a due process violation for its failure to preserve evidence, we had applied "a balancing test in determining whether the failure of the police to preserve potentially useful evidence had deprived a criminal defendant of due process of law under either the federal or state constitution. Relying on decisions of federal courts interpreting the federal constitution's due process clause, we had required a trial court, in determining whether the defendant had been deprived of his rights under either the federal or the state constitution, to weigh several factors. These factors included 'the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence.' *State* v.

*Asherman,* 193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985) . . . ." (Citations omitted.) *State* v. *Morales,* supra, 232 Conn. 719–20; see also id., 720 (noting that "we refer to these factors as the *Asherman* test").

Then, in *Morales,* we rejected the bad faith litmus test from *Youngblood* as inadequate to determine whether the defendant had been afforded due process under the state constitution, and instead we incorporated the *Asherman* balancing test as the appropriate framework for deciding whether the failure of the police to preserve evidence deprived the defendant of his state constitutional rights to due process. *State* v. *Morales,* supra, 232 Conn. 720. Accordingly, applying the *Asherman* test, we weigh the reasons for the unavailability of the evidence, the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury and the prejudice to the defendant. Id., 726–27. The first factor scrutinizes the state's involvement, and the remaining three examine the impact on the trial. Applying this test, we conclude that the defendant's rights to due process under the state constitution were not violated.

We begin with the state's involvement in the failure to preserve the evidence. We recognize the state's claim that it had no responsibility for Williams' deportation and that it had no ability or authority to control it. We need not, however, find that the state had control over federal immigration to hold the state accountable for Williams' unavailability. The state may not have known about Williams' actual deportation until after the fact, but it had worked closely with the federal government building its case against the defendant, it knew that Williams' cooperation was a factor in his federal sentence and it knew that deportation was a likely consequence of his felony conviction, as reflected in Williams'

sentencing hearing. Certainly, his unavailability was not mere happenstance, and the state could have notified the defendant of Williams' tape recordings, which it obtained in February, 2001, sometime before Williams was deported in April, 2001, to allow the defendant to interview and perhaps depose him. See Practice Book § 40-44. Accordingly, the state's tacit participation in the failure to preserve the evidence demonstrates its negligence and weighs in the defendant's favor.

We turn next to the remaining three factors, the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury and the prejudice to the defendant, all of which focus on the impact the failure to preserve Williams' testimony had on the defendant's trial. When he testified, the defendant admitted to the jury that he had spent nearly five hours recounting to Williams in exacting detail how he had ordered the robbery, participated in the murder and destroyed the evidence; he claimed, however, to have exaggerated his role in the crimes and to have lied to some degree to Williams because he was afraid of him and other violent felons with whom he was incarcerated. The defendant thought that it would be in his interest to earn a reputation as a "tough guy."

In deciding whether Williams' testimony would have been material,[17] we are guided by how we have defined that term in other preservation cases. In *State* v. *Baldwin*, 224 Conn. 347, 365, 618 A.2d 513 (1993), a case involving the destruction of evidence, decided before the *Morales* court's rejection of the *Youngblood* bad faith litmus test in a state due process analysis, this

---

[17] Evidence is material when it is offered to prove a fact directly in issue or a fact probative of a matter in issue. C. Tait, Connecticut Evidence (3d Ed. 2001) § 4.1.3. Relevant evidence is defined in § 4-1 of the Connecticut Code of Evidence as "evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence."

court stated that, in the absence of bad faith, "we apply a balancing test and first evaluate whether the missing evidence was material; that is, would the outcome of the trial have been different if the evidence had been made available? *United States* v. *Bagley*, 473 U.S. 667, 681–82, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). 'The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' Id., 682." *State* v. *Baldwin*, supra, 365. In other words, the defendant must show that Williams' testimony would have been helpful to him. In evaluating this issue, the theory of defense on which the case was tried becomes important. Id., 366. As we have noted previously, in the present case, the defendant presented duress as his theory of defense. Specifically, he had claimed that he felt threatened by Marrow and participated in the murder out of fear. Williams neither saw nor participated in the crimes, however, and therefore his testimony would have been irrelevant to the defendant's defense. Cf. *United States* v. *Hudson*, 265 F. Sup. 2d 1299, 1304–1305 (M.D. Fla. 2003) (immigration files of deported witnesses identified deportees as material witnesses to crime, one of whom had provided defendant with affidavit supporting defendant's version of events).

Because Williams could have testified to the circumstances surrounding the making of the tape recording, the defendant contends that his testimony was material. Certainly, his testimony might have been material had there been an issue of authenticity of the tape recording. There was no such issue in this case, however, only whether Williams had indeed threatened the defendant prior to turning on the tape recorder, thereby motivating the defendant to embellish the details of the crime so as to appear dangerous in his own right. Although Williams might have been cross-examined in this regard, there

is no reason to believe that he would have admitted to threatening the defendant in their previous conversations. Additionally, we note that the defendant could and in fact did explain the circumstances under which the conversations were held, providing the jury with the context in which the tape recording was created. Finally, the jury could listen to the tape—first, to compare and contrast it with Rivers' version of events as well as the defendant's versions of events surrounding the murder, and, second, to assess for itself whether the defendant's tone suggested that he was being truthful and thereby eliminate any legitimate concern of mistaken interpretation.

Indeed, the only other legitimate purpose that examination of Williams could have had was to show that he had received consideration by the federal government for his assistance in the present case, that prison is a place to be avoided and that Williams was, in general, someone to be feared. Williams' criminal involvement illustrating his criminal propensities and the relatively lenient treatment he received vis-a-vis the disposition of his cases were, however, put before the jury through the defendant's extensive cross-examination of the federal officers through whom the tape recording was offered.

In short, we cannot assume, and the defendant has not pointed us to any evidence to suggest, that Williams would have admitted to threatening the defendant prior to recording the conversations or that Williams said anything else to support the defendant's explanation of why he felt the need to embellish the details of the murder. Accordingly, the defendant has not demonstrated that Williams' testimony would have been favorable and, thus, that his absence was prejudicial.

## B

The defendant also claims that the state's failure to preserve Williams as an available witness violated his

right to compulsory process under the federal constitution. As the following discussion indicates, the analysis required for this claim substantially overlaps with the federal due process analysis we conducted in the preceding part of this opinion.

"The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense." (Citation omitted; internal quotation marks omitted.) *State* v. *West*, 274 Conn. 605, 624, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005).

"The right to present a defense, and its concomitant right to compulsory process, are not unqualified; they are subject to countervailing public interests, *Taylor* v. *Illinois*, 484 U.S. 400, 414, 108 S. Ct. 646, 655, 98 L. Ed. 2d 798 (1988), such as the state's responsibility for arresting and prosecuting suspected criminals. See e.g., *United States* v. *Valenzuela-Bernal*, 458 U.S. 858, 872–73, 102 S. Ct. 3440, 3449–50, 73 L. Ed. 2d 1193 (1982) (United States' interest in faithfully executing immigration policy). To establish a violation of the right to present a defense based on lost evidence, a defendant must show that the evidence was material and exculpatory, and that it was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *California* v. *Trombetta*, 467 U.S. 479, 489, 104 S. Ct. 2528, 2534, 81 L. Ed. 2d 413 (1984); see [*United States* v. *Valenzuela-Bernal*,

supra, 867]; *United States* v. *Rastelli*, 870 F.2d 822, 833 (2d Cir.), cert. denied [sub nom. *Agar* v. *United States*, 493 U.S. 982], 110 S. Ct. 515, 107 L. Ed. 2d 516 (1989). Moreover, unless the defendant can show bad faith on the part of the state, failure to preserve potentially useful evidence does not constitute a denial of due process of law. *Arizona* v. *Youngblood*, [supra, 488 U.S. 58]; [*California* v. *Trombetta*, supra, 488]; [*United States* v. *Valenzuela-Bernal*, supra, 872]. Finally, the misconduct must demonstrate that the absence of [fundamental] fairness infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial. [*United States* v. *Valenzuela-Bernal*, supra, 872]." (Internal quotation marks omitted.) *Buie* v. *Sullivan*, 923 F.2d 10, 11–12 (2d Cir. 1990).

Although bad faith is not a prerequisite to a due process claim under the state constitution; see part II A of this opinion; the other requirements set forth in our prior discussion, along with our analysis of why the defendant has failed to satisfy them, pertain equally to his federal confrontation clause claim. Accordingly, the defendant's sixth amendment claim also fails.

C

Finally, although the defendant raises a compulsory process claim under the state constitution, complete with the requisite analysis enunciated in *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992),[18] in the present

---

[18] When evaluating the rights afforded to Connecticut citizens under the state constitution, we consider, to the extent applicable, six factors: (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of our constitutional forebears; and (6) contemporary understandings of applicable economic and sociological norms. *State* v. *Geisler*, supra, 222 Conn. 685; see *State* v. *Michael J.*, 274 Conn. 321, 349–60, 875 A.2d 510 (2005) (citing and applying *Geisler* factors).

case, we have been unable to discern any textual[19] or historical basis for assigning independent meaning to our state constitutional provision. Cf. *State* v. *Joyce*, 229 Conn. 10, 19, 639 A.2d 1007 (1994), appeal after remand, 243 Conn. 282, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998). Our own precedents provide no direct support for such a distinction, and the defendant has pointed to only one court of our sister states that addressed the issue in the context of a deported alien witness. See *State* v. *Vargas*, 74 Or. App. 588, 704 P.2d 125, cert. denied, 300 Or. 180, 708 P.2d 1146 (1985). That court declined to read greater protection into its state constitution, which used language identical to the federal constitution. Id., 592 n.3. Finally, the defendant has advanced no compelling policy considerations to warrant a broader reading of the state compulsory process clause. Accordingly, we conclude that the defendant has failed to demonstrate a violation of his right to compulsory process under the state constitution.

The judgment is affirmed.

In this opinion SULLIVAN, C. J., and PALMER and ZARELLA, Js., concurred.

BORDEN, J., concurring. I agree with the result reached by the majority, affirming the judgment of the trial court. I reach that same result, however, by a different route.

---

[19] There is a slight textual difference in the two provisions. The federal constitution refers to the defendant's right to present evidence in his "favor"; U.S. Const., amend. VI; whereas the state provision refers to the right to present evidence in one's "behalf." Conn. Const., art. I, § 8. We fail to see how this difference would have any practical effect because no defendant rationally would present evidence on his behalf unless he thought it would be favorable.

I

The defendant, Miguel Estrella, first claims that he was deprived of his constitutional right of confrontation, under *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 354, 158 L. Ed. 2d 177 (2004), because at the probable cause hearing he did not have the opportunity to cross-examine an accomplice, Jonathan Rivers, about a letter that Rivers subsequently wrote admitting that he had lied at that hearing.[1] More specifically, the defendant's claim is that, under *Crawford,* he did not have an adequate opportunity to cross-examine Rivers at the hearing because that opportunity did not include the use of the letter in that cross-examination. The majority addresses this claim by concluding that "[m]easuring the defendant's ability to cross-examine Rivers on matters affecting his reliability and credibility in order to comport with the constitutional standards embodied in the right to cross-examine; *State* v. *Ortiz,* 198 Conn. 220, 224, 502 A.2d 400 (1985); we are satisfied that the defendant was provided the requisite procedural safeguard to the right of confrontation. *Crawford* v. *Washington,* supra, [61]. Accordingly, we conclude that the defendant had a more than adequate and full opportunity to cross-examine Rivers both generally and specifically to address whether Rivers was giving truthful testimony." The majority then goes on to conclude that the fact that the letter did not exist at the time of the hearing does not undermine its conclusion because "[e]ven if we were to assume without deciding that such evidence [namely, evidence that did not exist at the time of the prior opportunity for cross-examination] is relevant to the adequacy of the prior cross-examina-

---

[1] I fully agree with the majority's conclusions that Rivers' testimony at the hearing was "testimonial" within the meaning of *Crawford,* and that Rivers' invocation of his fifth amendment right not to incriminate himself rendered him "unavailable," and that, therefore, *Crawford* applies to the present case.

tion . . . the letter . . . did not introduce any new evidence . . . [and] did not provide specific details of the crime . . . ." Thus, on that basis, the majority rejects the defendant's claim that his opportunity for cross-examination at a prior occasion is only adequate when it is " 'identical to that afforded at trial.' " Quoting *State v. Outlaw*, 216 Conn. 492, 508, 582 A.2d 751 (1990). In sum, the majority's analysis rests on the assumption that evidence that did not exist at the time of the prior testimonial evidence is relevant to the claimed nonadmissibility under *Crawford*, of the prior testimonial evidence and the majority's assessment of the reliability of Rivers' testimony at the probable cause hearing, as well as its consequent conclusion that this element of reliability rendered the defendant's opportunity for cross-examination adequate under *Crawford*.

In my view, this approach misconstrues the import of *Crawford*, and makes what is a very simple question into a needlessly complex one. Contrary to the majority's assumption of relevance of nonexistent evidence under *Crawford*, I conclude that such evidence is simply irrelevant to a proper *Crawford* analysis.

It cannot be the law that, under *Crawford*, evidence that did not even exist at the time of the prior opportunity for cross-examination can somehow render that opportunity inadequate, and therefore render the prior testimony inadmissible. Put another way, whether the prior opportunity for cross-examination was adequate, within the meaning of *Crawford*, must be gauged on the basis of evidence that was, at the least, *in existence* at that time; evidence that did not come into existence until years later, such as the letter in the present case, is simply irrelevant to the adequacy of the prior cross-examination.[2] In short, whether the testimony that the

---

[2] I emphasize that I focus here only on evidence, such as the letter written by Rivers three years after his probable cause testimony, that did not exist at the time of that testimony. I do not discuss evidence that was in existence but was not discovered or discoverable by the defendant.

defendant now challenges as inadmissible under *Craw-ford* was *reliable* is simply beside the point. Once it is determined that, under *Crawford,* the witness is now unavailable and that his prior testimony was "testimonial," its reliability vel non is irrelevant; the only remaining question is whether the defendant had an adequate prior opportunity for cross-examination of the witness, and in my view the answer to that question cannot be affected, for good or ill, by evidence that did not even exist at the time of the initial cross-examination. I conclude, therefore, that the defendant's *Craw-ford* claim fails at its inception because the evidence on which he relies—Rivers' letter written three years later—did not exist at the time of Rivers' probable cause hearing testimony.

*Crawford* fundamentally changed our jurisprudence under the confrontation clause of the sixth amendment, as applied to the states through the fourteenth amendment. Whereas prior to *Crawford* our jurisprudence focused on whether hearsay was sufficiently reliable to satisfy the confrontation clause; see, e.g., *Ohio* v. *Roberts,* 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980); in *Crawford,* the United States Supreme Court changed the confrontation clause analysis from an assessment of reliability to the original understanding of the meaning of that clause. Thus, the court held that "the principal evil at which the [c]onfrontation [c]lause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused"; *Crawford* v. *Washington,* supra, 541 U.S. 50; and that "the [f]ramers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id., 53–54. Under the confrontation clause, therefore, "[t]estimonial statements of witnesses absent from trial have been

admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Id., 59. Furthermore, the court made clear that the inherent or contextual reliability of the statement at issue is irrelevant for confrontation clause purposes. "Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the [c]lause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The [c]lause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." Id., 61. Finally, the court made clear what has long been understood and never questioned, namely, that once testimony has been determined to come within—in the sense of violating—the confrontation clause, it is *inadmissible*. See id., 68–69 (court noted that out-of-court statement was inadmissible, and that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the [c]onstitution actually prescribes: confrontation"). Thus, once we determine that testimony is covered by *Crawford* in the sense of being testimonial, as is Rivers' probable cause testimony, if it were to violate *Crawford* for some other reason, it would be inadmissible.

Applying this analysis to the defendant's claim, the conclusion is inexorable, in my view, that the letter, which did not exist at the time of the defendant's prior opportunity to cross-examine Rivers, cannot affect the admissibility, under *Crawford*, of that testimony. It is simply inconceivable to me that we could conclude that evidence that did not exist at the time of the prior testimony could somehow retroactively make that testi-

mony *inadmissible* under the confrontation clause because the defendant did not have that evidence available to him.[3] Of course he did not, and could not. Put another way, because *Crawford* has dispensed with the reliability analysis of testimonial evidence for purposes of the confrontation clause, I simply do not see how it could inject reliability into the prior opportunity for cross-examination element based on evidence that could not have been available to anyone because it simply did not exist.

The following hypothetical demonstrates the problem with the majority's analysis. Suppose that in a probable cause hearing an expert testifies that, under the DNA technology available at the time, the blood found on the victim is that of the defendant, and suppose further that the defendant has an opportunity to cross-examine the witness regarding that evidence and does so. Now suppose that, by the time of the trial, the expert witness has died, and the state offers her probable cause testimony. Under *Crawford*, the probable cause testimony would be admissible because of the defendant's prior opportunity for cross-examination.

Now add the fact that, by the time of trial,[4] the defendant offers a new and, in his expert's opinion, more reliable type of DNA analysis, which was not in existence at the time of the prior testimony, that would tend to establish that the blood was not that of the defendant. The defendant objects to the admission of

---

[3] It is conceivable that there may be extreme circumstances in which evidence that subsequently comes into existence renders the prior testimonial evidence so patently unreliable that its admissibility would constitute a due process violation. That would not, however, involve a *Crawford* analysis. Moreover, this is not such a case.

[4] Let us also suppose, to make the hypothetical even more complicated, that there is a delay of several years between the probable cause hearing and the trial, because the defendant absconded to Switzerland, where he spent several years skiing in the Alps, and was then located and returned to Connecticut for trial.

the state's expert's prior probable cause testimony, arguing that under *Crawford* he did not have an adequate opportunity to cross-examine the witness because he did not have the later DNA evidence with which to cross-examine the expert and, therefore, that prior testimony of the witness is *inadmissible* under *Crawford*. If the majority's assumption in the present case is correct, the defendant in this hypothetical probably would be correct as well. That simply cannot be the law. Although the defendant certainly would be entitled to have the later DNA evidence *admitted*, he certainly could not be entitled to have the prior DNA testimony of the now deceased witness *excluded*.

Thus, the only legitimate question raised by the defendant's claim is not his *Crawford* claim of inadmissibility of Rivers' testimony based on the letter—which I would summarily reject because the letter simply did not exist at the time of Rivers' testimony—but his second claim, namely, that the trial court improperly excluded the letter. That, therefore, brings me to the defendant's second claim.

## II

I agree with the majority that the letter was improperly excluded as impeachment evidence of Rivers' probable cause testimony, but that the error was harmless. Without belaboring the point, I would also conclude, however, contrary to the majority's posture of not deciding the question, that the trial court's error was evidentiary and not constitutional.

It seems quite clear to me that there is no foundation—unless I am missing something—for a constitutional basis for the letter's admissibility. It is not bias or motive evidence; it is nothing more than evidence that impeaches Rivers' prior testimony at the probable cause hearing, and the trial court abused its discretion in excluding it. Thus, the error was evidentiary, and

not constitutional. For all of the reasons given by the majority, however, I agree that the trial court's decision to exclude the letter was harmless.

PALMER, J., concurring. I agree with, and therefore join, the majority opinion. I also agree generally with the view expressed by Justice Borden in his concurrence that *Crawford* v. *Washington,* 541 U.S. 36, 124 S. Ct. 354, 158 L. Ed. 2d 177 (2004), does not bar the state from using the probable cause hearing testimony of Jonathan Rivers merely because Rivers' recantation letter, which did not exist at the time of that hearing, was not available to the defendant when counsel cross-examined Rivers. Because the majority does not take a position contrary to that view, I join the majority opinion.